Filed 7/16/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br>    Plaintiff and Respondent, <br><br>    v. <br><br> MARCELO SALVADOR CAPARROTTA, <br><br>    Defendant and Appellant. | D083314 <br><br><br><br> (Super. Ct. No. FWV21004734) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Corey G. Lee, Judge. Affirmed.

Kevin Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Marcelo Caparrotta guilty of one count of elder abuse likely to produce great bodily harm or death (Pen. Code, § 368, subd. (b)(1)) (count 1), and one count of making a criminal threat (*id.*, § 422) (count 2).

After making a true finding that Caparrotta incurred a prior strike and finding the existence of several aggravating factors, the trial court sentenced Caparrotta to a prison term of six years.

Caparrotta contends that (1) the trial court erred in sustaining objections to two of the peremptory strikes he exercised during jury selection; (2) insufficient evidence supports a finding that he inflicted elder abuse under conditions likely to produce great bodily harm or death; (3) it was error to instruct, as stated in CALCRIM No. 830, that "great bodily harm" is "an injury that is greater than minor or moderate harm"; (4) the trial court erred in imposing a middle term sentence without acknowledging the lower term sentence that Caparrotta contends was presumptively required under Penal Code section 1170, subdivision (b)(6) due to the presence of a mitigating factor; and (5) the trial court improperly imposed certain fines and fees.

We conclude that Caparrotta's arguments lack merit, and we accordingly affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Caparrotta's father (Father) is in the latter half of his seventies.[1] Father has arthritis, walks with a cane, and is no taller than 5'3". On December 12, 2021, Father was sitting in his living room, watching television. Caparrotta was at the house and, according to Father, was loud and drunk. Father asked Caparrotta to leave the house because he did not want to engage with Caparrotta in an argument about Caparrotta's girlfriend.

---

[1]    At trial in April 2022, Father testified that he was 77 years old. The events at issue in this appeal occurred less than six months earlier, in December 2021, which means that Father was 76 or 77 at the time.

As Father testified, Caparrotta reacted by punching Father in the head several times.[2] The blows were "strong." They knocked Father out of his seat to the ground, and they made Father's glasses fly off his face. While Father was on the ground, Caparrotta hit Father three times in the ribs before leaving the house. Father testified that as a result of the assault, his face was "full of blood," he was bleeding from his ear, and he had cuts and scrapes on his arm.

Paramedics arrived and treated Father at the scene, but Father did not go to the hospital. Photographs of Father taken by police after the assault show injuries to Father's face, ear and arm.

Several days after the assault on Father, Caparrotta left a voicemail message on his brother's phone in which he threatened to kill his brother and said he was going to "fuck up dad, too. Again."

Caparrotta was charged with one count of elder abuse likely to produce great bodily harm or death (Pen. Code, § 368, subd. (b)(1));[3] and one count of making a criminal threat (Pen. Code, § 422).

The jury convicted Caparrotta on both counts. The trial court made a true finding that Caparrotta incurred a prior strike. It also found the existence of four aggravating circumstances (Pen. Code, § 1170, subd. (b)(2)), namely that (1) the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty,

---

[2] During his direct examination, Father stated that Caparrotta punched him three times in head. On cross-examination, Father explained that it was difficult for him to remember exactly how many times Caparrotta hit him, but he believed he was punched two or three times.

[3] Prior to trial, the People dismissed a further allegation that, in committing elder abuse, Caparrotta personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (c)).

3

viciousness, or callousness; (2) the victim was particularly vulnerable; (3) Caparrotta's prior convictions were numerous or of increasing seriousness; and (4) Caparrotta had served a prior term in prison.

At sentencing, the trial court denied Caparrotta's motion to strike his prior strike. It imposed a prison sentence of six years, composed of a three-year middle term sentence on the elder abuse conviction, doubled due to the prior strike, with a concurrent 365-day sentence on the criminal threat conviction.

## II.

## DISCUSSION

A.    *Caparrotta Has Not Established That the Trial Court Prejudicially Erred in Sustaining the People's Objections to Defense Counsel's Exercise of Peremptory Challenges During Jury Selection*

We first consider Caparrotta's contention that the trial court erred in sustaining the People's objections to two of the peremptory challenges exercised by defense counsel during jury selection. Specifically, Caparrotta contends that the trial court erred by improperly interpreting the statutory provisions governing its evaluation of the People's objections.

1.    *Applicable Statutory Standards*

To evaluate Caparrotta's argument, we first discuss the applicable statutory provisions. Effective January 1, 2021, Code of Civil Procedure[4] section 231.7 governs the procedures for identifying the discriminatory exercise of peremptory challenges during jury selection for criminal trials. (§ 231.7, subds. (i), (k).) As Caparrotta's trial was in April 2022, the trial court applied section 231.7.

---

[4]    Unless otherwise noted, all statutory references are to the Code of Civil Procedure.

4

Section 231.7, subdivision (a) states that "[a] party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups."  During jury selection, either a party, or the trial court on its own motion, may object that a peremptory challenge has been exercised on an improper basis.  (§ 231.7, subd. (b).)  When an objection has been made, "the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised."  (§ 231.7, subd. (c).)

In a series of detailed subdivisions, section 231.7 sets forth the procedure that the trial court must follow in evaluating whether, in light of the reasons that the party has identified for exercising the peremptory challenge, the objection should be sustained.

The first subdivision detailing the relevant procedure is subdivision (d)(1) of section 231.7, which states:  "The court shall evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances.  The court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge.  If the court determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge, then the objection shall be sustained.  The court need not find purposeful discrimination to sustain the objection."

Section 231.7, subdivision (d)(3) states that "[i]n making its determination" under subdivision (d)(1), "the circumstances the court may consider include, but are not limited to, any of the following . . . ." The list that follows is an extensive description of items the trial court may consider:

"(A) Whether any of the following circumstances exist: [¶] (i) The objecting party is a member of the same perceived cognizable group as the challenged juror. [¶] (ii) The alleged victim is not a member of that perceived cognizable group. [¶] (iii) Witnesses or the parties are not members of that perceived cognizable group.

"(B) Whether race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, bear on the facts of the case to be tried.

"(C) The number and types of questions posed to the prospective juror, including, but not limited to, any the following: [¶] (i) Consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge pursuant to subdivision (c). [¶] (ii) Whether the party exercising the peremptory challenge engaged in cursory questioning of the challenged potential juror. [¶] (iii) Whether the party exercising the peremptory challenge asked different questions of the potential juror against whom the peremptory challenge was used in contrast to questions asked of other jurors from different perceived cognizable groups about the same topic or whether the party phrased those questions differently.

"(D) Whether other prospective jurors, who are not members of the same cognizable group as the challenged prospective juror, provided similar, but not necessarily identical, answers but were not the subject of a peremptory challenge by that party.

"(E) Whether a reason might be disproportionately associated with a race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups.

6

"(F) Whether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record.

"(G) Whether the counsel or counsel's office exercising the challenge has used peremptory challenges disproportionately against a given race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, in the present case or in past cases, including whether the counsel or counsel's office who made the challenge has a history of prior violations . . . ." (§ 231.7, subd. (d)(3).)

Next, section 231.7, subdivisions (e) and (g) provide that when a party identifies any of a number of specific reasons for exercising a peremptory challenge a presumption of invalidity arises.

The statute uses the term "presumptively *invalid*" (§ 231.7, subds. (e), (g), italics added) but does not define the term "invalid." In the context of the statute as a whole, we understand "invalid" to refer to invalidity under section 231.7, subdivision (a), which states that "[a] party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (§ 231.7, subd. (a).) Put another way, an "invalid" reason is one that is based on race, ethnicity, gender, gender identity, sexual orientation, national origin, religious affiliation, or perceived membership in any such group.

The presumptions of invalidity set forth in subdivisions (e) and (g) of section 231.7 are distinct, and the methods for rebutting them are different.

With respect to the presumption of invalidity set forth in section 231.7, subdivision (e), that provision states, "A peremptory challenge for any of the following reasons is presumed to be invalid unless the party exercising the

7

peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." Section 231.7, subdivision (e) sets forth 13 specific reasons that raise the rebuttable presumption.[5] The procedure for rebutting the presumption identified in subdivision (e) of section 231.7 is more fully discussed in subdivision (f).

With respect to the presumption of invalidity set forth in section 231.7, subdivision (g), the statute states, "The following reasons for peremptory challenges have historically been associated with improper discrimination in jury selection: [¶] (A) The prospective juror was inattentive, or staring or

---

[5]     The reasons set forth in section 231.7, subdivision (e) are as follows: "(1) Expressing a distrust of or having a negative experience with law enforcement or the criminal legal system. [¶] (2) Expressing a belief that law enforcement officers engage in racial profiling or that criminal laws have been enforced in a discriminatory manner. [¶] (3) Having a close relationship with people who have been stopped, arrested, or convicted of a crime. [¶] (4) A prospective juror's neighborhood. [¶] (5) Having a child outside of marriage. [¶] (6) Receiving state benefits. [¶] (7) Not being a native English speaker. [¶] (8) The ability to speak another language. [¶] (9) Dress, attire, or personal appearance. [¶] (10) Employment in a field that is disproportionately occupied by members listed in subdivision (a) or that serves a population disproportionately comprised of members of a group or groups listed in subdivision (a). [¶] (11) Lack of employment or underemployment of the prospective juror or prospective juror's family member. [¶] (12) A prospective juror's apparent friendliness with another prospective juror of the same group as listed in subdivision (a). [¶] (13) Any justification that is similarly applicable to a questioned prospective juror or jurors, who are not members of the same cognizable group as the challenged prospective juror, but were not the subject of a peremptory challenge by that party. . . ." (§ 231.7, subd. (e).)

8

failing to make eye contact. [¶] (B) The prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor. [¶] (C) The prospective juror provided unintelligent or confused answers." (§ 231.7, subd. (g)(1).)

Subdivision (g)(2) of section 231.7 identifies the reasons set forth in subdivision (g)(1) as presumptively invalid, and it also provides a two-step procedure for rebutting that presumption of invalidity. "The reasons set forth in paragraph (1) are presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party. Even with that confirmation, the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (§ 231.7, subd. (g)(2).) Subdivision (g)(2) of section 231.7 is centrally relevant here because, as we will explain, the trial court relied on it in making its ruling.

2.      *Standard of Review*

Section 231.7, subdivision (j) sets forth the standard of review to be used in an appeal from the *denial* of an objection made under section 231.7. "The denial of an objection made under this section shall be reviewed by the appellate court de novo, with the trial court's express factual findings reviewed for substantial evidence. The appellate court shall not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record. The reviewing court shall consider only reasons actually given under subdivision (c) and shall not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of

9

the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court." (§ 231.7, subd. (j).)

In this case, however, we are reviewing the trial court's decision to *sustain* an objection made under section 231.7. No opinion has specifically discussed the standard of review that should apply in such a circumstance, but we need not resolve that question to decide this appeal. Here, Caparrotta's appellate argument with respect to section 231.7 is limited to a contention that the trial court applied an incorrect legal standard due to its misinterpretation of the statute. " 'The proper interpretation of a statute is a question of law we review de novo.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 461.)

### 3. *The Relevant Proceedings During Jury Selection*

Caparrotta contends that the trial court erred in sustaining the prosecutor's objection to defense counsel's peremptory challenge of prospective juror No. 17 and prospective juror No. 19. We discuss, in turn, the relevant proceedings regarding those prospective jurors.

### a. *Prospective Juror No. 17*

During jury selection, defense counsel exercised a peremptory challenge to prospective juror No. 17, who was a White female. When the trial court asked defense counsel to state the reason for the challenge, the following discussion took place between defense counsel and the trial court.

> "[DEFENSE COUNSEL]: I exercised my peremptory because of the way she answered some of the questions when posed to her. I think with this particular juror, I spent a majority of the time asking about how she judges the credibility of the witnesses. And she talked about body language and the way somebody looks. [¶] But in my discussion with her, I could sense a shift in her body language. I could sense that she was a little bit more

10

closed at some points. I even asked her a question, and I asked her to elaborate on what she meant. She broke down and she said, 'I'm not sure. I don't want to answer that.'

"THE COURT: I remember that question. That's a hard question. It wasn't a clear question. I don't think anyone would know how to answer that.

"[DEFENSE COUNSEL]: Sure. But that, combined with the body language, she answered she has law enforcement connections. The totality of everything, I chose to excuse her."

After further discussion, defense counsel restated her reason for challenging the prospective juror, focusing on body language: "At some time she stopped and broke down communication and didn't want to proceed further. Whether or not the court thought it was a difficult question, it was the body language she exhibited towards me. It appeared to me she wasn't even willing to consider anything further and consider the conversation. Which is why I stopped talking to her."

The trial court sustained the prosecutor's objection, explaining that it "didn't really see" the body language that defense counsel described. The trial court stated, "So basically the way I'm looking at it is I'm evaluating the reasons given. When the reasons are given to me, and it doesn't seem to be justified -- because in this case, it appears to be some sort of a body language that I didn't really see; and maybe on a personal level, you may not have liked the body language, but all the answers that she's given, and in my perspective of her body language, it didn't really shout bias to me in any manner or any problem." Later the trial court reiterated, "So in my view, looking at it objectively, I didn't really see that kind of an interpretation or body language. She seemed like a fair juror by her answers and her body language and the way she answered all of the questions. She seemed like one

11

of the ideal jurors who can be fair in this case and the ability to see both sides. . . . I just didn't see any reason for it."

        b.    *Prospective Juror No. 19*

Defense counsel also challenged prospective juror No. 19, who was a White female. When asked to provide a reason, defense counsel explained that during jury selection the previous day, when prospective juror No. 19 was in the courtroom but was not yet selected as a prospective juror, defense counsel made a point about the presumption of innocence by asking certain jurors if they "had to go and deliberate right now, how would they deliberate." According to defense counsel, when prospective juror No. 19 was asked the same question "she said she wouldn't be able to deliberate again. Based on that, it went to show her inability to pay attention, her inability to be seated, and to impartially listen to the evidence, in my opinion."

The trial court responded by stating that it was going to sustain the prosecutor's objection because it did not concur with defense counsel's description of prospective juror No. 19's statements. Specifically, the trial court recalled that prospective juror No. 19 "ultimately said that she would follow the law, and . . . ultimately pretty much said, 'Oh, yeah. It would be not guilty.' " Defense counsel pushed back and said, "I don't think she ultimately said that. She said that she wouldn't have an answer for us." The trial court replied, "No. I have in my notes she would say not guilty specifically. So I don't know what you have in your notes, [defense counsel], but I have that specifically; and I noted that." After additional discussion, the trial court once again explained, "This is a person who definitely said she's going to say not guilty if there's no evidence." The prosecutor confirmed

that she also did not "believe the record would support" defense counsel's reason for striking prospective juror No. 19.[6]

#### 4. *Caparrotta's Contention That the Trial Court Applied the Wrong Procedure for Evaluating the Prosecutor's Objections*

In ruling on the prosecutor's objections to defense counsel's peremptory challenges, the trial court stated it was applying subdivision (g) of section 231.7. Under subdivision (g), the following reasons for exercising a peremptory challenge are "presumptively invalid": "(A) The prospective juror was inattentive, or staring or failing to make eye contact. [¶] (B) The prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor. [¶] (C) The prospective juror provided unintelligent or confused answers." (§ 231.7, subd. (g)(1).)

Here, Caparrotta concedes that at least some of the reasons that defense counsel identified for challenging prospective juror No. 17 and prospective juror No. 19 fall within the scope of section 231.7, subdivision (g)(1). Specifically, the challenge to prospective juror No. 17 was based on body language and problematic attitude. The challenge to prospective juror No. 19 was based on inattentiveness and the provision of unintelligent or confused answers. We note, however, that one of the reasons given for challenging prospective juror No. 17, namely, her "law enforcement connections," is a facially neutral reason that does not, on its face, fall under

---

[6] Caparrotta does not ask us to examine the sufficiency of the evidence to support the trial court's conclusion that defense counsel's reason for challenging prospective juror No. 19 lacked support in the record. Although the issue is not before us, we note that the reporter's transcript shows that the trial court correctly recalled that prospective juror No. 19 ultimately said she would return a verdict of not guilty if she had to deliberate without hearing any evidence.

the presumption of invalidity created by subdivisions (e) or (g) of section 231.7.[7]

As stated in subdivision (g)(2) of section 231.7, when a party identifies a reason for challenging a prospective juror that is set forth in subdivision (g)(1), that reason is "presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party." (§ 231.7, subd. (g)(2).) If that requirement is met, the second step of the procedure set forth in subdivision (g)(2) requires counsel to "explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (§ 231.7, subd. (g)(2).) Here, for both prospective juror No. 17 and prospective juror No. 19, the trial court concluded at the first step that it was *not* able to confirm that the asserted behavior occurred. The trial court therefore did not proceed to the second step of the procedure set forth in section 231.7, subdivision (g)(2), and it sustained the prosecutor's objections.

      a.     *There is No Merit to Caparrotta's Contention That a Presumption of Invalidity Under Subdivision (g) of Section 231.7 Only Arises, in the First Instance, When the Trial Court Is Unable to Confirm the Behavior Identified by Counsel, Requiring It to Then Proceed to an Analysis Under Subdivision (d)*

Caparrotta contends that the trial court erred because, as he reads the statute, when the trial court determined that it could not confirm the behavior identified by defense counsel, that determination did nothing more than raise a presumption of invalidity *in the first place*. According to

---

[7] Throughout our discussion we will refer to a reason for a peremptory challenge that does not, on its face, fall within the scope of either subdivision (e) or subdivision (g) of section 231.7 as a "facially neutral reason."

14

Caparrotta, the trial court was required to perform a *further* analysis, based on the totality of the circumstances approach described in subdivision (d) of section 231.7, to decide whether the newly-raised presumption of invalidity was rebutted. As Caparrotta explains, "Under subdivision (g)(2), the proffered reasons under subdivision (g)(1) only *become* 'presumptively invalid' *in the first place*, requiring rebuttal, when the trial court *does not* 'confirm that the asserted behavior occurred.' Therefore, the trial court's refusal to confirm, as here, does not end the inquiry, but rather *triggers* the challenging party's right to *rebut* the presumption by citing the factors in subdivision (d)(3) and statistical analysis." (Italics added.) In Caparrotta's view, the trial court erred because it did not proceed to an analysis under section 231.7, subdivision (d) to determine whether the presumption of invalidity had been rebutted.

Based on the language of the statute, we reject Caparrotta's understanding of the statutory framework. The statute states: "The reasons set forth in paragraph (1) *are* presumptively invalid *unless* the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party. Even with that confirmation, the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (§ 231.7, subd. (g)(2), italics added.) This language indicates that the reasons identified in section 231.7, subdivision (g)(1) *start out* as presumptively invalid and that the only way to rebut the presumption of invalidity is by applying the statutorily prescribed two-step process of (1) confirmation of the behavior by the trial court, and (2) explanation by counsel of why the behavior matters to the case. If the presumption of invalidity for a particular reason identified by

15

counsel is not rebutted through the two-step procedure set forth in subdivision (g)(2) of section 231.7, that reason must be treated as *conclusively* invalid. In other words, the trial court must treat *as conclusive* the presumption that the reason identified by counsel was actually based on "race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation," or perceived membership in any such group, as prohibited by section 231.7, subdivision (a). Contrary to Caparrotta's contention, the totality of the circumstances analysis in section 231.7, subdivision (d) plays no role in determining whether a presumption of invalidity arising under subdivision (g) has been rebutted.

Consistent with this understanding, we have recently explained that only "*[o]nce* the court has determined that the party seeking to exercise the peremptory challenge has *overcome* the presumption of invalidity as to a stated reason, the court may consider that stated reason in the section 231.7, subdivision (d)(1) analysis as to whether it is substantially likely that a reasonable person would consider that race was a factor in the challenge." (*People v. Jimenez* (2024) 99 Cal.App.5th 534, 541, italics added.) As another court has described the statute, "[c]ertain demeanor-based reasons for excusing jurors are . . . now presumptively invalid *unless* independently confirmed by the trial court and the demeanor 'matters to the case to be tried.'" (*People v. Uriostegui* (2024) 101 Cal.App.5th 271, 279, italics added.)

Caparrotta contends that *People v. Ortiz* (2023) 96 Cal.App.5th 768 (*Ortiz*) supports his reading of the statute. It does not. On the contrary, *Ortiz* demonstrates that the two-step analysis in subdivision (g)(2) of section 231.7 is used to determine whether a presumption of invalidity arising under subdivision (g) has been rebutted. In *Ortiz*, the prosecutor challenged a prospective juror for a reason that was presumptively invalid

16

under subdivision (g) of section 231.7. The trial court therefore performed the two-step inquiry set forth in section 231.7, subdivision (g)(2) by (1) confirming that the juror exhibited the behavior described by the prosecutor; and (2) asking the prosecutor to explain why the juror's behavior mattered to the case to be tried. (*Ortiz*, at pp. 788–791, 797, 801.) *Ortiz* explained that, with those two requirements fulfilled, "the proffered reason that falls under section 231.7, subdivision (g)(1) is no longer presumptively invalid." (*Ortiz*, at p. 804.)

In sum, neither the text of section 231.7, subdivision (g), nor the case law applying it, supports Caparrotta's contention that a failure to satisfy the two-step procedure in subdivision (g)(2) does nothing more than raise a presumption of invalidity *in the first place*. On the contrary, the role of the two-step procedure set forth in section 231.7, subdivision (g)(2) is to determine whether the presumption of invalidity has been rebutted. If the trial court determines that the requirements of subdivision (g)(2) of section 231.7 are not satisfied, the proffered reason becomes *conclusively* invalid at that point.

> b. *Even Though Defense Counsel Identified One Facially Neutral Reason for Challenging Prospective Juror No. 17, the Trial Court Properly Sustained the Objection Because Defense Counsel's Other Reasons Were Conclusively Invalid Under Subdivision (g) of Section 231.7*

Another question arises from the facts of this case: What happens when counsel identifies *multiple* reasons for exercising a peremptory challenge? Where, as here, the presumption of invalidity for a reason falling under section 231.7, subdivision (g) becomes *conclusive*, must the trial court nevertheless conduct a totality of the circumstances analysis under subdivision (d) for any remaining facially neutral reasons? The issue is presented here with respect to prospective juror No. 17. Specifically, defense

17

counsel identified prospective juror No. 17's "law enforcement connections" as an additional reason for exercising the peremptory challenge, which is a facially neutral reason. Although Caparrotta's appellate briefing did not expressly argue that defense counsel's reference to prospective juror No. 17's law enforcement connections required the trial court to proceed to an analysis under subdivision (d) of section 231.7, the issue falls within the scope of Caparrotta's broader contention that the trial court erred by sustaining the objection as to prospective juror No. 17 without first conducting a subdivision (d) analysis. We accordingly asked the parties to provide us with relevant supplemental briefing.

In their supplemental briefing, the People take the position, without discussion, that when a facially neutral reason for a peremptory challenge is given *in addition to* a reason that has become conclusively invalid under subdivision (g) of section 231.7, the trial court must proceed to analyze the facially neutral reason under subdivision (d) before deciding whether to sustain an objection to a peremptory challenge. Accordingly, the People believe that the trial court's analysis regarding the peremptory challenge of prospective juror No. 17 was flawed.[8]

However, the People contend that although the trial court should have conducted an analysis under section 231.7, subdivision (d) for prospective

_____

[8]   Caparrotta's supplemental briefing did not specifically address his view on whether the presence of a facially neutral reason for a peremptory challenge requires the trial court to conduct an analysis under subdivision (d) of section 231.7 where another reason for the peremptory challenge has been determined to be conclusively invalid under subdivision (g). Instead, Caparrotta's supplemental briefing reiterated the argument in his opening and reply briefs that a trial court must conduct an analysis under subdivision (d) of section 231.7 for *all* of the reasons identified for the peremptory challenge, even when the trial court is not able to confirm the behavior of the prospective juror as required by subdivision (g)(2).

juror No. 17 due to the "law enforcement connections" identified by defense counsel, Caparrotta "forfeited" the right to have the trial court conduct such an analysis because defense counsel did not press for it in the trial court. The People rely on *People v. Lewis* (2008) 43 Cal.4th 415 for their forfeiture argument, but that case has no application here. In *Lewis*, decided prior to section 231.7 under the *Wheeler/Batson* approach to assessing peremptory challenges,[9] our Supreme Court found forfeiture based on an objecting party's failure to obtain a ruling *on an objection* to the exercise of a peremptory challenge. (*Lewis*, at p. 481.) *Lewis* explained that "[t]he failure to articulate clearly a *Wheeler/Batson* objection forfeits the issue for appeal." (*Lewis*, at p. 481.) Here, in contrast, Caparrotta was the party who *exercised* the peremptory challenge, not the party *objecting* to it. When a party is faced with an objection to a peremptory challenge, all that is required by section 231.7 is for the party to set forth the reasons for exercising the peremptory challenge. (§ 231.7, subd. (c) [stating that "upon objection to the exercise of a peremptory challenge pursuant to this section, the party exercising the peremptory challenge shall state the reasons the peremptory challenge has been exercised"].) It is then up to the trial court to correctly apply the procedure set forth in section 231.7 when deciding whether to sustain the objection. Defense counsel fulfilled her obligation under section 231.7 because she identified her reasons for challenging prospective juror No. 17. No more was required. We accordingly reject the People's claim of forfeiture.

We therefore turn to the question of whether the presence of a facially neutral reason for a peremptory challenge requires the trial court to conduct

9    *People v. Wheeler* (1978) 22 Cal.3d 258; *Batson v. Kentucky* (1986) 476 U.S. 79.

an analysis under section 231.7, subdivision (d), even when other reasons for the peremptory challenge have been determined to be conclusively invalid under subdivision (g). "Our goal in construing a statute is 'to determine and give effect to the intent of the enacting legislative body.' [Citation.] ' "We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent." ' " (*Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 490 (*Holland*).) Here, the statutory language does not provide explicit direction about what a trial court should do if one of the reasons for the challenge becomes conclusively invalid under subdivision (g) of section 231.7, but other facially neutral reasons remain.

However, subdivision (d)(1) of section 231.7 points toward an answer because, under that provision, a trial court would end up at a foregone conclusion were it to undertake an analysis under subdivision (d) when one reason was already determined to be conclusively invalid. Specifically, section 231.7, subdivision (d)(1) provides that "[i]f the court determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as *a factor* in the use of the peremptory challenge, then the objection *shall* be sustained." (§ 231.7, subd. (d)(1), italics added.) As we have explained, a conclusively invalid reason is one that has been determined to be based on "race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation," or perceived membership in any such group, as prohibited by section 231.7, subdivision (a). It follows, therefore, that if at least one of the reasons for the peremptory challenge has become *conclusively* invalid because the presumption of invalidity has not been rebutted, an

20

objectively reasonable person would *necessarily* conclude that the impermissible category was at least "a *factor* in the use of the peremptory challenge." (§ 231.7, subd. (d)(1), italics added.) In that case, the trial court would *invariably* be required to sustain the objection if it undertook an analysis under section 231.7, subdivision (d) because the statute states that the objection "*shall* be sustained." (*Id.*, subd. (d)(1), italics added.) The Legislature is unlikely to have intended that a trial court proceed to an analysis under section 231.7, subdivision (d) when that analysis would lead to a foregone conclusion sustaining the objection in circumstances where a reason for the challenge has already been determined to be conclusively invalid under subdivision (g).

Although we view the statutory language as tending to support the conclusion that a trial court must sustain an objection to a peremptory challenge when one of counsel's identified reasons becomes conclusively invalid under subdivision (g) of section 231.7, even if other facially neutral reasons remain, we acknowledge that the statute is not clear on this issue. Indeed, as we have explained, the People have adopted the opposite statutory interpretation, although without any explanation of why they have done so. The People's interpretation is a plausible reading of the statutory language because subdivision (d)(1) of section 231.7 states that when an objection to a peremptory challenge is made under subdivision (b) and reasons are given under subdivision (c), the court must "evaluate *the reasons* given . . . in light of the totality of the circumstances" pursuant to the standards set forth in subdivision (d). (§ 231.7, subd. (d)(1), italics added.) Based on this broad language, the statute could be read as requiring a totality of the circumstances analysis under section 231.7, subdivision (d) for any *remaining* facially neutral reason identified in support of a peremptory challenge.

21

Further, nothing in the statute *explicitly* states that the existence of a single conclusively invalid reason automatically requires the objection to be sustained, without an analysis under section 231.7, subdivision (d), even if there are remaining facially neutral reasons.

When a "statute is susceptible to more than one interpretation, we 'may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute.' " (*Holland , supra,* 58 Cal.4th at p. 490.) We therefore turn to those sources to determine the Legislature's intent.

First, as stated in an uncodified section of the bill leading to the enactment of section 231.7, "[t]he Legislature intended that the new law 'be *broadly construed* to further the purpose of eliminating the use of group stereotypes and discrimination, whether based on conscious or unconscious bias, in the exercise of peremptory challenges.' " (*Ortiz, supra,* 96 Cal.App.5th at pp. 791–792, italics added [quoting Stats. 2020, ch. 318, § 1, subd. (c)].) If adopted, however, the People's interpretation would, in some circumstances, allow the exercise of a peremptory challenge for reasons the Legislature has deemed to be indicative of group stereotypes and discrimination, as long as the party can also express a facially neutral reason. Under that approach, the exercise of a peremptory challenge for a reason the Legislature has found to be indicative of discrimination would be insufficient, by itself, to establish an objective appearance of discrimination. This interpretation would undermine the Legislature's goal of eliminating group stereotypes and discrimination in jury selection.

Second, the Legislature's overriding intent was to make it easier to prove discrimination in the use of peremptory challenges. "The author and sponsors of the bill, as well as many legal experts, argue[d] that the current

22

Batson-Wheeler system makes it nearly impossible to prove discrimination in the use of peremptory challenges." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 3070 (2019–2020 Reg. Sess.) as amended May 4, 2020, p. 7.) By adopting an objective standard of discrimination, defining it to include both conscious and unconscious bias, requiring that reasons be given whenever an objection to a peremptory challenge is made, and disallowing certain reasons that were seemingly neutral, but still closely associated with discrimination, the Legislature hoped to overcome "deficiencies" in the *Wheeler-Batson* process. (*Id.* at p. 7.) And by setting the bar deliberately high, the Legislature decided "it was best to err on the side of protecting the prospective juror and parties of the case from discriminatory behavior." (*Id.* at p. 14.) All of this supports a broad interpretation of the statute disallowing any peremptory challenge that is exercised *even in part* for a conclusively invalid reason.

Finally, the Legislature passed Assembly Bill No. 2542 (2019–2020 Reg. Sess.) enacting the Racial Justice Act (Pen. Code, § 745) in the same 2019–2020 legislative session as section 231.7. (Stats. 2020, ch. 317, § 1 et seq.) As enacted, section 3 of the Racial Justice Act contained a provision that was similar to section 231.7 and would have become operative only if section 231.7 had not been enacted into law in the same session. (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 7.) Specifically, if section 231.7 had not been enacted, section 3's backup provision would have gone into effect instead and would similarly have authorized relief to a criminal defendant if "[r]ace, ethnicity, or national origin was *a factor* in the exercise of peremptory challenges" and stated that "purposeful discrimination" is not required to demonstrate a violation. (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 3, italics added.)

23

In enacting the Racial Justice Act (Pen. Code, § 745), the Legislature declared "[t]here is growing awareness that *no degree or amount of racial bias* is tolerable in a fair and just criminal justice system." (Stats. 2020, ch. 317, § 2(h), italics added.) The Legislature further stated: "It is the intent of the Legislature to eliminate racial bias from California's criminal justice system because *racism in any form or amount*, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California. . . . It is the intent of the Legislature to ensure that *race plays no role at all* in seeking or obtaining convictions or in sentencing." (*Id.*, § 2(i), italics added.) This declaration of legislative intent for a closely related bill enacted in the same legislative session as section 231.7—with a backup provision containing materially the same substance and wording regarding discriminatory exercise of peremptory challenges—reinforces the conclusion that the Legislature did not intend to allow a peremptory challenge to be exercised, even in part, for an invalid reason. (See *People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 729 [bills enacted in same legislative session on same subject are presumed to embody the same policy and be intended to have effect together].)

For all these reasons, we conclude that the most reasonable interpretation of the statutory language, considered together with extrinsic indicators of legislative intent, is that an objection to a peremptory challenge must be sustained whenever any reason identified for the challenge becomes conclusively invalid under section 231.7, subdivision (g), regardless of whether the party exercising the peremptory challenge also identifies facially neutral reasons that do not fall within the scope of subdivision (g). It is

24

unlikely that the Legislature would have required the trial court to conduct an analysis with a foregone conclusion. As we have explained, when there has already been a determination that a conclusively invalid reason played a role in the peremptory challenge, any objective observer would necessarily conclude the invalid reason was "a *factor* in the use of the peremptory challenge." (§ 231.7, subd. (d)(1), italics added.) Further, because the Legislature that passed section 231.7 had the goal of *eliminating* the use of group stereotypes and discrimination *in any form or amount* (Stats. 2020, ch. 318, § 1, subd. (c); Stats. 2020, ch. 317, § 2, subds. (h), (j)), the Legislature would not have set up a procedure under which a trial court could overrule an objection after a peremptory challenge was *already* determined to be based, at least in part, on an invalid reason.

Accordingly, the trial court properly sustained the prosecutor's objection to defense counsel's challenge to prospective juror No. 17 without conducting an analysis under subdivision (d) of section 231.7 even though defense counsel also identified a facially neutral reason for the peremptory challenge.

c.     <em>There Is No Merit to Caparrotta's Contention That, to Avoid an Absurd Result, Section 231.7 Must Be Interpreted to Require an Analysis Under Subdivision (d)</em>

Next, Caparrotta argues that, even assuming his argument for an analysis under subdivision (d) of section 231.7 is not supported by the statutory language, "the plain meaning of a statute should not be followed when to do so would lead to 'absurd results.'" (*People v. Broussard* (1993) 5 Cal.4th 1067, 1072.) Caparrotta contends that it would lead to an "absurd consequence" to interpret section 231.7 "to require the defense to accept more 'white females' onto the jury when the case has nothing to do with white women, who comprised at least half of the venire and the final jury." In

Caparrotta's view, to avoid that absurd result the Legislature must have intended that the trial court consult the circumstances set forth in section 231.7, subdivision (d) in assessing whether a presumption of invalidity arising under subdivision (g) has been rebutted, even when the trial court cannot confirm the behavior of the prospective juror. According to Caparrotta, if the trial court had performed an analysis under section 231.7, subdivision (d) it could have avoided a purportedly absurd result by considering, among other things, "[w]hether race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, bear on the facts of the case to be tried" and "[w]hether the counsel . . . exercising the challenge has used peremptory challenges disproportionately against a given race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, in the present case." (§ 231.7, subd. (d)(3)(B), (G).)

The argument fails because there are rational reasons for the Legislature to have created the presumption of invalidity set forth in subdivision (g) of section 231.7 and to specify that the presumption can be rebutted *only* by using the procedure described in subdivision (g)(2). As the Legislature expressly stated in the statutory text of section 231.7, subdivision (g)(1), the reasons for exercising peremptory challenges that are identified in subdivision (g) "have historically been associated with improper discrimination in jury selection." (§ 231.7, subd. (g)(1).) In the context of that historical background, it is far from absurd to interpret the statute as providing that a reason falling within the scope of subdivision (g) of section 231.7 will be considered invalid unless the trial court (1) is able to confirm the prospective juror's behavior cited as the reason for the

26

peremptory challenge, and (2) the party exercising the challenge is able to explain why that behavior matters to the case to be tried. The procedure set forth in section 231.7, subdivision (g)(2) serves a reasonable gate-keeping function and streamlines the process for evaluating objections raised under section 231.7.[10]

In sum, we conclude that Caparrotta has not established that the trial court erred in sustaining the prosecutor's objections to defense counsel's peremptory challenges to prospective juror No. 17 and prospective juror No. 19.

B.  *Substantial Evidence Supports a Finding That Caparrotta Committed Elder Abuse Under Conditions Likely to Produce Great Bodily Harm or Death*

We next consider Caparrotta's challenge to the sufficiency of the evidence to support the conviction for elder abuse likely to produce great bodily harm or death. (Pen. Code, § 368, subd. (b)(1).)

" ' "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the

_____

[10]  In addition, Caparrotta relies on extrinsic sources to suggest that White females were not intended to be a cognizable group protected from discrimination during jury selection under section 231.7. We reject the argument, as the statute plainly identifies both gender and race in the provision stating that "[a] party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (§ 231.7, subd. (a).)

judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations.  [Citation.]  '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.'  [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility." ' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117–1118.)

Caparrotta was convicted of violating Penal Code section 368, subdivision (b)(1), which applies when a person commits elder abuse "under circumstances or conditions likely to produce great bodily harm or death." (Pen. Code, § 368, subd. (b)(1).)  Caparrotta contends his conviction must be reversed because there was insufficient evidence to support a finding that he acted "under circumstances or conditions likely to produce great bodily harm or death." (*Ibid.*)

We begin by examining the phrase "under circumstances or conditions likely to produce great bodily harm or death" as used in Penal Code section 368, subdivision (b)(1).[11]  "Whether the injury is inflicted under circumstances or conditions likely to produce great bodily injury is a question for the trier of fact." (*People v. Clark* (2011) 201 Cal.App.4th 235, 245 (*Clark*).)  "[C]ircumstances and conditions a reasonable jury could consider include, but are not limited to, (1) the characteristics of the victim and the

---

[11]    In interpreting that phrase, we may rely on opinions interpreting Penal Code section 273a, subdivision (1), which criminalizes child abuse "under circumstances or conditions likely to produce great bodily harm or death," because "[c]ases interpreting one section are . . . appropriately used to interpret the other." (*People v. Valdez* (2002) 27 Cal.4th 778, 785, fn. 4.)

28

defendant, (2) the characteristics of the location where the abuse took place, (3) the potential response or resistance by the victim to the abuse, (4) any injuries actually inflicted, (5) any pain sustained by the victim, and (6) the nature of and amount of force used by the defendant." (*Ibid.*, fn. omitted.) " 'Great bodily harm refers to significant or substantial injury and does not refer to trivial or insignificant injury.' " (*People v. Cortes* (1999) 71 Cal.App.4th 62, 80.) There is no requirement the victim *actually* suffer great bodily injury, only that the circumstances are *likely* to produce such injury. (*Roman v. Superior Court* (2003) 113 Cal.App.4th 27, 35 (*Roman*).) " '[L]ikely' as used [in this context] means a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death." (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204; see also *People v. Sargent* (1999) 19 Cal.4th 1206, 1216 [in dicta, quoting an opinion that stated the child abuse statute was " 'intended to protect a child from an abusive situation in which the probability of serious injury is great' "].)

Focusing mainly on the fact that Father did not actually sustain any serious injury, aside from bleeding, cuts and scrapes, Caparrotta contends that insufficient evidence supports a finding of circumstances or conditions likely to produce great bodily harm or death. According to Caparrotta, "[e]ven though [Father] fell to the floor . . . it is undisputed that he did not actually suffer any great bodily injury. . . . Moreover, he only suffered a minor injury or a bloody ear, declined to go to the hospital, and did not receive any further medical treatment." He argues that "[j]ust because [Father] was elderly and fell off the couch when struck does not mean [Caparrotta's] actions rose to the level of felony assault."

We reject the argument because case law has held that similar types of assaults, involving less force than Caparrotta inflicted on Father, and not

resulting in significant injury, were sufficient to support a finding that the defendant acted under conditions and circumstances likely to produce great bodily harm.

In *People v. Racy* (2007) 148 Cal.App.4th 1327 (*Racy*), the defendant entered the home of a 74-year-old man and demanded money. (*Id.* at p. 1330.) When the victim refused, the defendant immediately " 'zapped' " the victim in the leg with a stun gun, causing pain the victim described as "similar to a 'poke' from an ice pick." (*Id.* at pp. 1330–1331.) Despite his diabetes and knee problems, the victim walked to the bedroom and tried to lock the door, but the defendant chased after him and prevented him from doing so. (*Id.* at p. 1331.) The victim lay down on his bed with his feet in the air, and for the next 10 minutes, the defendant asked the victim for money while " 'zapp[ing]' " the stun gun " 'in the air.' " (*Ibid.*) Next, the defendant " ' tip[ped] [the victim] over,' exposing his wallet," which the defendant grabbed while tearing the victim's pants pocket. (*Ibid.*) The victim unsuccessfully attempted to resist. (*Ibid.*) At some point during the struggle, the victim " 'tripped.' " (*Ibid.*) The defendant then left the house. (*Ibid.*) The victim did not seek medical attention. (*Ibid.*)

*Racy* concluded that substantial evidence supported a finding that the defendant acted under circumstances or conditions likely to produce great bodily harm. (*Racy*, *supra*, 148 Cal.App.4th at p. 1333.) *Racy* explained, "[T]he jury reasonably could have concluded that defendant's close pursuit of [the victim] (which prevented [the victim] from locking the door) or the force defendant exerted on [the victim] (which was strong enough to tip him over, tear his jean pocket, and cause a struggle in which [the victim] tripped and the bed moved one foot) likely could have caused [the victim] to fall and break a bone, causing him great bodily harm. As stated, [the victim's] knees are

30

disabled and he is 74 years old, which, as a matter of common knowledge, is an age that carries with it an increased risk of bone fractures from a fall. The jury was in the best position to observe [the victim's] condition at trial, and we will not second-guess the jury's finding." (*Ibid.*)

Similarly, in a child abuse case, the defendant tripped his 14-year-old son, who fell to the ground on his back. (*Clark, supra*, 201 Cal.App.4th at p. 241.) The defendant then repeatedly slapped his son in the head. (*Ibid.*) The son incurred abrasions on his back. (*Ibid.*) The court concluded that substantial evidence supported a finding that the defendant acted under circumstances or conditions likely to produce great bodily harm. "[A] reasonable jury rationally could conclude that there was a substantial danger of eye injury had the son made an unanticipated turn of the head in an effort to resist defendant. Also, it would be rational to conclude that falling on rocky ground onto one's back involved sufficient force to make great bodily harm likely on impact. In such a fall, there was a substantial danger of the son's head hitting the ground, thus presenting a serious risk of head injury. Also, it is common knowledge that falling to the ground as the result of an unexpected tripping creates a substantial danger of broken bones, torn ligaments or other injuries." (*Id.* at p. 246.) The court also noted that "the jury was in a position to see and assess the physical characteristics of the victim and defendant." (*Id.* at p. 245.)

Here, as in *Racy* and *Clark*, the jurors were in the best position to observe Father's physical characteristics as he testified at trial, from which they could assess the danger posed by Caparrotta's attack. During Caparrotta's assault on Father, he caused Father to fall to the ground, and he struck Father with several "strong" punches, both in the head and in the ribs, causing a great amount of bleeding. Father is in the latter half of his

31

seventies, and he has arthritis and walks with a cane. The jury could reasonably conclude that, under the circumstances, Father likely could have incurred broken bones, an eye injury, internal bleeding, or another serious medical complication. Although Caparrotta focuses on the fact that Father did not end up needing medical attention beyond what the paramedics provided, there is no requirement the victim actually suffer great bodily harm. (*Roman, supra,* 113 Cal.App.4th at p. 35.) We accordingly conclude that substantial evidence supports a finding that Caparrotta acted under circumstances and conditions likely to produce great bodily harm.

C.    *Caparrotta's Challenge to the Jury Instruction Defining "Great Bodily Harm" Is Without Merit*

As we have discussed, to convict Caparrotta of elder abuse under Penal Code section 368, subdivision (b)(1) the jury was required to find that he acted "under circumstances and conditions likely to produce great bodily harm or death." (Pen. Code, § 368, subd. (b)(1).) Caparrotta contends that the trial court used a flawed instruction in defining "great bodily harm" for the jury.

"A claim of instructional error is reviewed de novo. . . . In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*), citations omitted.)[12]

_____

[12]    Caparrotta did not object to the instruction in the trial court. In most circumstances, failure to object to an instruction results in the forfeiture of an appellate challenge. (*Mitchell, supra,* 7 Cal.5th at p. 579.) However, failure

Based on the standard language in CALCRIM No. 630, the trial court instructed the jury as follows: "Great bodily harm means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." Focusing on the part of this definition that refers to "an injury that is greater than minor or moderate harm," Caparrotta contends that "the disjunctive language of 'greater than minor *or* moderate harm' allows the jury in a close case to base a felony conviction on mere likelihood of infliction of *more than minor harm* rather than *more than moderate harm*."[13] As Caparrotta correctly observes, if a jury reached that understanding it would be wrong because "[g]reat bodily injury is bodily injury which is significant or substantial, not insignificant, trivial *or moderate*." (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066, italics added.)

Caparrotta rests his argument on *People v. Medellin* (2020) 45 Cal.App.5th 519 (*Medellin*). In *Medellin,* the trial court instructed the jury with CALCRIM Nos. 875 and 3160 which, using the same language as in CALCRIM No. 630, defines great bodily injury as " 'significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.' " (*Medellin*, at p. 531.) The parties agreed that the prosecutor misstated the law during closing argument by expressly referring to the instructional language and then stating, "An injury that is greater than

_____

to object to instructional error will not result in forfeiture if the substantial rights of the defendant are impacted. (*Ibid.*) Because " ' "[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice" ' " (*People v. Franco* (2009) 180 Cal.App.4th 713, 719), we exercise our discretion to consider the argument on appeal.

13    Identical language appears in numerous CALCRIM instructions that define either "great bodily injury" or "great bodily harm."

minor.  That is all I need to prove." (*Ibid.*)  The question on appeal was whether the error was prejudicial.  (*Id.* at p. 530.)

A divided panel of the Fifth District Court of Appeal concluded that the error was prejudicial because there was a reasonable likelihood that the jury understood or applied the prosecutor's argument in an improper or erroneous manner.  (*Medellin, supra*, 45 Cal.App.5th at p. 536.)  In reaching that conclusion, the majority determined that the instructional language was ambiguous.  According to the majority, " '[u]nder the plain language of the instruction, the jury could have convicted' [defendant] if they believed either greater than minor harm or greater than moderate harm was sufficient. [Citation.]  'The instruction's "use of the word 'or' . . . indicates an intention to use it disjunctively so as to designate alternative or separate categories." ' " (*Id.* at p. 534.)  In the view of the majority, "the CALCRIM great bodily injury definition 'may impermissibly allow a jury to' find great bodily injury means greater than minor harm alone is sufficient." (*Id.* at p. 534.)  The concurring and dissenting justice disagreed with this analysis because she did not perceive any ambiguity in the instruction.  (*Id.* at p. 538 (conc. & dis. opn. of Detjen, J.).)

Shortly after *Medellin* was decided, two different panels in the Fifth District reviewed the same instructional language and found no ambiguity. (*People v. Sandoval* (2020) 50 Cal.App.5th 357, 361 (*Sandoval*); *People v. Quinonez* (2020) 46 Cal.App.5th 457, 465–467 (*Quinonez*).)

In *Sandoval*, the majority explicitly disagreed with the reasoning of *Medellin* and concluded that CALCRIM's great bodily injury definition "d[oes] not permit a reasonable finding of ambiguity." (*Sandoval, supra*, 50 Cal.App.5th at p. 360.)  The majority explained: " '[A] jury instruction cannot be judged on the basis of one or two phrases plucked out of

34

context . . . .' [Citations.] Thus, it is improper to assess the correctness of the instructional definitions of great bodily injury by focusing exclusively on the use of 'or' in the phrase 'minor or moderate harm.' Rather, that phrase cannot be divorced from the one that immediately precedes it: 'injury that is *greater than*' (italics added). '[I]njury that is greater than minor or moderate harm' cannot reasonably be read to mean injury that is more than minor but less than moderate. Such an interpretation simply does not make sense, legally or grammatically, particularly when the phrase is preceded by the explanation that great bodily injury means physical injury that is 'significant or substantial.'" (*Id.* at p. 361.)

Similarly, *Quinonez* explained that the "instructions did not allow the jury to find defendant guilty and the enhancements true upon the determination that [the victim's injury] only constituted 'moderate' harm. Instead, the instructions expressly stated the jury had to find [the] injuries were 'significant or substantial,' consistent with the well-recognized definition of great bodily injury." (*Quinonez, supra,* 46 Cal.App.5th at p. 466.)

We agree with *Sandoval, Quinonez* and the concurring and dissenting justice in *Medellin*. When read as a whole and in context, the definition of great bodily harm in CALCRIM No. 630 is neither erroneous nor ambiguous. The instruction "clearly informed jurors that great bodily [harm] meant significant or substantial physical injury, i.e., injury that was greater than moderate harm." (*Sandoval, supra*, 50 Cal.App.5th at p. 362.) Therefore, Caparrotta's challenge to CALCRIM No. 630 is without merit.

D.  *The Trial Court Did Not Err in Sentencing Caparrotta to a Middle Term Sentence*

Caparrotta next contends that the trial court erred during sentencing because it did not consider a presumptive lower term sentence based on a

social worker's report stating that, as a child, Caparrotta was abused and sexually molested.

Caparrotta's argument is based on amendments to Penal Code section 1170, subdivision (b), which became effective on January 1, 2022, several months before his sentencing in June 2022. (Stats. 2021, ch. 695, § 5.3.) Based on those amendments, a trial court may impose no greater than a middle term sentence unless it relies on aggravating factors that (with the exception of prior convictions in a certified record) have been found true beyond a reasonable doubt or stipulated to by the defendant. (Pen. Code, § 1170, subd. (b)(1)–(3).) As especially relevant here, newly enacted subdivision (b)(6) provides, in relevant part, that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of *the lower term* if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (Pen. Code, § 1170, subd. (b)(6), italics added.)

In advance of sentencing, Caparrotta submitted a report from a social worker describing the physical, verbal and sexual abuse Caparrotta experienced as a child. Caparrotta's sentencing memorandum expressly argued that because of the childhood abuse, the trial court should select a lower term sentence under Penal Code section 1170, subdivision (b)(6). Caparrotta also relied on the history of childhood abuse to argue that the trial court should strike his prior strike.

In pronouncing sentence, the trial court first observed that it had previously made a true finding as to several aggravating factors. It then

continued, "Having said that, all of this, I considered the aggravating and mitigating factors. I also considered the mitigating factors presented by defense in the [motion to strike the prior strike]. I've also considered the facts presented at trial with regards to various charges found true." The trial court continued, "So even though I found the aggravating factors true, I am also considering the mitigating factors in the overall sentence that I believe is reasonable in this case, given the circumstances, the seriousness of the crime, and prior history." The trial court concluded, "And considering all the mitigating and aggravating circumstances, what I'm going to do is I'm going to sentence the defendant to the midterm for count 1 . . . ." Defense counsel made no objection to the trial court's explanation of how it had arrived at its sentence.

Caparrotta argues that the trial court erred in pronouncing sentence because "[w]hat is notably absent from this analysis is *any mention* whatsoever of the presumptive requirement of a low-term sentence now required by [Penal Code] section 1170(b)(6), based on the evidence submitted by the defense in its sentencing memorandum. There is no attempt by the court to make the findings explicitly required by the new law before imposing any sentence other than the low term, based on the defense evidence and argument presented: whether the evidence of trauma . . . 'was a contributing factor in the commission of the offense'; and whether 'the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice.' " Relying on *People v. Salazar* (2023) 15 Cal.5th 416, 419, 431–432, Caparrotta emphasizes that a trial court is *required* to consider a lower term sentence under Penal Code section 1170, subdivision (b)(6) when a qualifying trauma was a contributing factor in the commission of the offense. He contends that

37

the trial court failed to follow that requirement. Caparrotta seeks a remand so that the trial court may consider whether to impose a lower term sentence under Penal Code section 1170, subdivision (b)(6).

We reject Caparrotta's argument because nothing in the record establishes that the trial court was unaware of its obligations under Penal Code section 1170, subdivision (b)(6) or that it failed to apply that provision. "In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.'" (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) Thus, although the trial court did not specifically mention Penal Code section 1170, subdivision (b)(6), it is presumed to have known of the provision. Moreover, because Caparrotta highlighted Penal Code section 1170, subdivision (b)(6) in his sentencing memorandum, we presume that the trial court was aware Caparrotta was seeking to benefit from that provision.

Penal Code section 1170, subdivision (b)(6) requires the imposition of the lower term when certain mitigating circumstances are present "*unless* the court finds that the aggravating circumstances outweigh the mitigating circumstances." (Pen. Code, § 1170, subd. (b)(6), italics added.) Consistent with Penal Code section 1170, subdivision (b)(6), the trial court indicated at the sentencing hearing that it had expressly weighed the aggravating and mitigating circumstances, and that, as a result, it had decided to impose a middle term sentence. Under those circumstances, Caparrotta has failed to establish that the trial court erred.[14]

---

[14] The record plainly reflects that, as required by Penal Code section 1170, subdivision (b)(6), the trial court weighed the mitigating circumstance of Caparrotta's childhood abuse against the aggravating factors it found to be true. As we understand Caparrotta's argument, even though the trial court weighed the mitigating and aggravating factors, he faults the

E.  *Caparrotta's Appellate Contentions Concerning the Trial Court's Imposition of Fines and Fees Are Without Merit*

Finally, we consider Caparrotta's arguments arising out of the trial court's imposition of certain fines and fees.

At sentencing the trial court imposed the following fines and fees:  a $5,400 restitution fine (Pen. Code, § 1202.4, subd. (b));  a suspended parole revocation fine (Pen. Code, § 1202.45, subd. (b));  a $30 court facilities fee (Gov. Code, § 70373, subd. (a)(1));  and a $40 court operations fee (Pen. Code, § 1465.8, subd. (a)(1)).  Defense counsel did not object to any of the fines and fees.

1.  *Caparrotta Forfeited His Contention That the Trial Court Erred in Failing to Explain the Reason for Selecting a $5,400 Restitution Fine, and the Contention Is Without Merit*

Caparrotta first argues that the trial court erred in not explaining the reason that it was setting the amount of the restitution fine at $5,400.

Penal Code section 1202.4, subdivision (b)(1) states, "The restitution fine shall be set at the discretion of the court and commensurate with the

---

trial court for not using the statutory language to state that "imposition of the lower term would be contrary to the interests of justice."  (Pen. Code, § 1170, subd. (b)(6).)  For that argument, Caparrotta relies on *People v. Hilburn* (2023) 93 Cal.App.5th 189 and *People v. Fredrickson* (2023) 90 Cal.App.5th 984.  Neither case lends support.  Both cases discuss only the first step of the trial court's analysis under Penal Code section 1170, subdivision (b)(6), in which the trial court makes findings on whether a mitigating circumstance set forth in subdivision (b)(6) exists and whether that circumstance was a contributing factor in the commission of the offense.  (*Hilburn*, at pp. 204–205; *Fredrickson*, at pp. 991–994.)  Nothing in either *Hilburn* or *Fredrickson* can be read to suggest that, once the trial court moves to the *next* analytical step, in which it weighs the mitigating and aggravating factors, the trial court must expressly state, using the statutory language, that as a result of weighing the applicable factors, it has concluded that "imposition of the lower term would be contrary to the interests of justice." (Pen. Code, § 1170, subd. (b)(6).)

39

seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)." The statute provides that "[e]xpress findings by the court as to the factors bearing on the amount of the fine shall not be required." (Pen. Code, § 1202.4, subd. (d).) Here, the trial court imposed a restitution fine of $5,400 without explaining why it chose that amount.

In arguing that the trial court erred in not explaining why it chose the amount of $5,400, Caparrotta acknowledges that the statute says "[e]xpress findings by the court as to the factors bearing on the amount of the fine shall not be required." (Pen. Code, § 1202.4, subd. (d).) However, without any citation to authority, Caparrotta contends that the trial court erred because "there must be at least some rudimentary explanation of reasons for increasing the minimum restitution fine of $300 to the exorbitant amount of $5,400 for there to be a reasonable exercise of discretion." Caparrotta's argument fails for two reasons.

First, the argument is forfeited. "As a general rule neither party may initiate on appeal a claim that the trial court failed to make or articulate a " 'discretionary sentencing choice[ ].' '" (*In re Sheena K.* (2007) 40 Cal.4th 875, 881.) "[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356.)

Second, Caparrotta's argument is foreclosed by the clear statutory language stating that the trial court need not explain how it applied the relevant factors to arrive at the amount of the restitution fine. (Pen. Code, § 1202.4, subd. (d).) The trial court was required to do nothing more than state it had selected the amount of $5,400 as the appropriate restitution fine.

40

2. *Caparrotta Forfeited His Contention That the Trial Court Was Required to Consider Whether He Had the Ability to Pay the Fines and Fees*

Caparrotta contends that the trial court abused its discretion and violated his constitutional rights by imposing fines and fees without considering whether he had the ability to pay them. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 and the cases following it. *Dueñas* reversed an order imposing the court operations assessment and the court facilities assessment after concluding it was "fundamentally unfair" and violated the defendant's due process rights under the federal and California Constitutions to impose those assessments without determining the defendant's ability to pay them. (*Dueñas,* at p. 1168.) Our Supreme Court has granted review to decide issues raised by *Dueñas.* (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

We reject Caparrotta's argument because it is forfeited. "In general, a defendant who fails to object to the imposition of fines and fees at sentencing forfeits the right to challenge those fines and fees on appeal." (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 224 (*Ramirez*).) Caparrotta was sentenced in June 2022, "more than three years after *Dueñas* was decided. Thus, 'there is no reason why [Caparrotta] could not have requested an ability-to-pay hearing based on *Dueñas.*' [Citation.] '[Caparrotta's] apparent decision to not raise the issue at the felony sentencing hearing forfeits [his] arguments on appeal.' " (*Ramirez*, at p. 225.)

Caparrotta contends that, in the event we determine his challenge to the fines and fees is forfeited, we should nevertheless still grant him relief on appeal because defense counsel was ineffective for not arguing at sentencing that the trial court was required to consider Caparrotta's inability to pay when imposing the fines and fees. "[W]here—as here—a claim of ineffective

41

assistance of counsel is made on direct appeal, ineffective assistance of counsel will be found only if the record affirmatively demonstrates trial counsel had no rational tactical purpose for the challenged act or omission. [Citations.]  Here, the record does not affirmatively demonstrate [Caparrotta's] counsel had no rational tactical purpose for failing to object to the imposition of the challenged fines and fees.  Defense counsel may have had access to information about [Caparrotta's] financial status, including the possibility of his earnings while in prison, that would make such an objection unsuccessful.  We therefore conclude that [Caparrotta] has not demonstrated his trial counsel was ineffective in failing to object to the imposition of the fines and fees." (*Ramirez, supra*, 98 Cal.App.5th at p. 226, fn. omitted.)

## DISPOSITION

The judgment is affirmed.

                                                   IRION, Acting P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.